UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL CARSON,

    Plaintiff,

                                              Case No. 07-13991

-vs-                                       HON. AVERN COHN

FORD MOTOR CO.,

    Defendant.

_____/

## MEMORANDUM AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

    This is an employment discrimination case.  Plaintiff Michael Carson (Carson) claims defendant Ford Motor Co. (Ford) terminated him because he filed a grievance with the U.S. Equal Employment Opportunity Commission (EEOC) and because of a physical disability.  Ford says Carson was caught opening file cabinet drawers while cleaning administrative offices.

    The complaint is in two counts:

    (I) Retaliation under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e-5, and under Titles I and V of the American with Disabilities Act of 1990 (ADA) as amended, 42 U.S.C. § 1210; and

    (II) Disability under Titles I and V of the ADA and under Michigan's Persons with Disabilities Act, M.C.L. 37.1101.

    For the reasons that follow, the motion is GRANTED.

## II. FACTS

The facts are taken from the parties' pleadings and exhibits, including the depositions of Carson; Brenda Mende (Mende), Administrative Assistant to the Powertrain Quality Director; Cathy Carpenter (Carpenter), Human Resources (HR) manager for hourly employment and personnel services; Robert Michalowicz (Michalowicz), head of the Labor Relations Department (LR); Donnie Williams (Williams), LR representative; and Susan Chen, LR representative.

### A. Background

Carson began working for Ford in May 1973 as a cleaner at the Rouge Steel Plant. In 1984 he developed ulcerative colitis. His colon was removed and he is now subject to frequent and uncontrollable bowel movements. He requires immediate access to a bathroom.

In late 1989 Rouge Steel became Severstal and Carson became a Severstal employee. In 2004, Carson exercised his option to return to Ford as an hourly employee. He and many other former Severstal employees were first assigned to the "TTS" building at Ford and placed in a "gen pool" while awaiting new positions. Employees in the gen pool received benefits and eight (8) hours of pay per day. The classification of all the employees who transferred from Severstal was that of Production Associate.

Carson was one of several employees with medical restrictions. When Ford places an employee with restrictions, LR sends the employee to a plant with open positions within the employee's classification. The employee, plant doctor, local placement committee, and union representative meet to review open positions to find a

2

job that falls within the employee's restrictions.  If the employee can safely perform the job, he is assigned to the open position.  If the employee cannot perform the job, LR continues the search for a suitable position.

### B.  Carson Files a Charge of Discrimination

On November 24, 2004, after awaiting placement in the TTS building for several weeks, Carson filed a charge of discrimination (2004 Charge) with the Michigan Department of Civil Rights and the U.S. Equal Employment Opportunity Commission (EEOC).  He claimed that based on his disability he was denied reasonable accommodation for his medical restrictions, placed on permanent layoff status, and denied a job assignment.

While the 2004 Charge was being investigated, LR contacted Carson about available assembly jobs.  His restrictions at the time numbered four: (1) no heavy equipment operation; (2) immediate lavatory access; (3) close parking permit; and (4) ground-level work only.  Efforts to place him with these restrictions failed because the available assembly jobs were ones that he could not perform.  He was laid off and received 80% of his regular pay and unemployment benefits of $362 a week.

On August 31, 2005, the EEOC issued a Determination of a finding of probable cause regarding Carson's 2004 Charge.  In January 2006 it closed its file on the case.

### C.  HR Assigns Carson to the Position of Cleaner

In August or September of 2005, Carson was assigned to an open cleaner position at the Rouge Office Building (ROB), a job that included cleaning restrooms.  Carson had immediate access to the lavatory and was provided a gate pass, which were the only two restrictions indicated by his latest medical re-evaluation.  He was

assigned to the day shift under Patrick McCarthy (McCarthy). When he complained about cleaning dirty restrooms, he was assigned other cleaning responsibilities instead.

### D.  Carson's Supervisors Receive Complaints

After Carson began work as a cleaner, McCarthy and Mike Longfellow-Jones, the ROB Section Supervisor for Planning and Engineering Support, received complaints about his job performance.

On March 14, 2006, McCarthy put Carson on notice for leaving the job and building without permission or notice.

On June 9, 2006, Carson was disciplined for failing to report to work on time for a job that he had been told was very time-sensitive. In McCarthy's write-up for the June 9 incident, he noted that Carson had previously been told "there was no more room for excuses and poor work."

On September 15, 2006, McCarthy noted that following a meeting with Carson, the van that Carson used to report to his jobs was still in the parking lot one-and-one-half hours after the meeting finished.

### E.  The Incident of February 21, 2007

On the morning of February 21, 2007, Mende reported to her supervisor Colleen Moynihan (Moynihan) that when she arrived at work she heard a cleaner rapidly opening and closing several of Moynihan's file cabinet drawers and saw the cleaner closing a file cabinet drawer.

Moynihan directed Mende to report the incident to Andy Shashlo (Shashlo), the Rouge Site Manager. Shashlo contacted Michalowicz and told him that there was an incident concerning a cleaner on the third floor of the ROB and he should send

someone up to investigate. Michalowicz directed Williams to contact Mende and investigate.

### 1.  Security Officer Takes Mende's Oral Statement

A security officer went to Mende's office and took her oral statement. The officer's written report read:

> The employee by the name of Brenda Mende witnessed Mike Carson of Building Services rambling through C. Moynihan's office desk. The door was locked at the end of the shift on 02/20/07 for Moynihan office. Once B. Mende reported to work on 02/21/07 the doors were all unlocked and the lights were all off and Mr. Carson was rambling. There has been no apparent theft but they will notify security if otherwise at a later date.

Security officers later searched Carson's car and lockers but did not find any stolen or suspicious items.

### 2.  Mende's Written Statement

Williams requested a written statement from Mende. She reported to him via e-mail. Mende said when she confronted the cleaner about what he was doing, he had two responses: (1) he had brought up a bin for shredding and (2) he thought the offices were vacant.

### 3.  Carson's Statement

Williams was unable to locate Carson to interview him regarding Mende's statement. Williams asked McCarthy to locate Carson; McCarthy was initially unable to reach him on his cell phone. When McCarthy reached Carson, around 11:30 a.m., he said he had taken an early lunch.[1]

---

[1] Carson says he was joking and that he actually missed the calls because of cell phone "dead zones."

Williams interviewed Carson at LR with union representative Mack Clay present. When asked if he had known that Moynihan's office was occupied, Carson replied, "Yeah it had to be because her trash cans were full."

### 4.  Williams and Michalowicz Terminate Carson

After reviewing Mende's and Carson's statements, Williams and Michalowicz made the decision to terminate Carson for "Improper Conduct."  Neither met with Mende.  Michalowicz testified they made their decision after considering (1) Mende's and Carson's statements, particularly regarding whether Carson thought the offices were vacant; (2) Mende's credibility; (3) Carson's disappearance to an "early lunch" following the incident; and (4) the fact that no one could locate Carson's car during his disappearance.

### F.  Levels of Involvement in the Significant Events

Mende was not involved in Ford's investigation of and response to Carson's 2004 Charge.  Mende said in her statement and testimony that she did not know who the cleaner was until Security had her identify a picture.

Williams was not involved in Ford's investigation of and response to Carson's 2004 Charge.

Carpenter was responsible for responding to Carson's 2004 Charge and locating a suitable position for him.  She was not involved in the investigation of the February 2007 incident nor the decision to terminate Carson.

Michalowicz testified that he did not learn until late March 2007, when he handled the third stage of Carson's grievance protesting his termination, that the cleaner he and Williams had terminated was the same employee who filed the 2004 Charge.  At the

6

time of the events in question, according to Carpenter, the Rouge site had approximately five thousand employees.

Carson admits that none of the individuals involved in the decision to terminate his employment made any derogatory or discriminatory remarks towards him or regarding his medical restrictions.

### III.  LEGAL STANDARD

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see Anderson, 477 U.S. at 249–50.

### IV.  ANALYSIS

For the reasons discussed below, Carson has failed to raise a genuine issue of material fact concerning retaliation; Carson has not proffered probative evidence of a causal connection between either the 2004 Charge or his disability and his termination in 2007.

### A. Retaliation

**1.**

Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" allowed for by Title VII. 42 U.S.C. § 2000e-3(a). Retaliation claims are analyzed under the McDonnell Douglas-Burdine[2] framework. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000).

To establish a prima facie case of retaliation Carson must show: (1) he engaged in a statutorily protected activity; (2) Ford knew of the protected activity; (3) Ford took an adverse employment action; and (4) a casual connection exists between the statutorily protected activity and the adverse employment action. Id. Under ELCRA, a plaintiff must also show that the protected activity was a "significant factor" in the adverse action. Polk v. Yellow Freight Systems Inc., 801 F.2d 190, 198–99 (6th Cir. 1986). If Carson establishes a prima facie case, the burden shifts to Ford to articulate a legitimate, non-discriminatory reason for termination; if Ford does so, the burden shifts

---

[2] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

back to Carson to demonstrate that the reason advanced by Ford is (1) not the real reason, (2) not sufficient to explain the adverse action, or (3) not the only reason for the adverse action. Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 526 (6th Cir. 2008).

A causal connection can exist between the protected activity and termination even if the time span is more than one year. Harrison v. Metro. Gov't of Nashville, 80 F.3d 1107, 1119 (6th Cir. 1996) (rejecting argument that a causal connection cannot exist with a time span of fifteen months), *abrogated on other grounds by* Jackson v. Quanex Corp., 191 F.3d 647, 667 n.6 (6th Cir. 1999). However, where "some time" elapses between the time the employer learns of a protected activity and the subsequent adverse action, the employee must couple temporal proximity with other evidence of retaliatory motives of the decision maker. Mickey, 516 F.3d at 525.

**2.**

Because more than two years elapsed between the protected activity and his termination, Carson has the burden to produce evidence of retaliation beyond the fact of the 2004 Charge. He has failed to do so. Additionally, the following facts are undisputed:

(1)  Mende knew Carson was a cleaner but did not know his name. Carson has proffered no evidence that Mende had any ax to grind with him when she reported the incident or that management had any reason to distrust her statement.

(2)  In an affidavit, Carson said Williams told him the decision to terminate was made prior to interviewing him. Carson did not say this in his deposition. He has proffered no corroboration from Williams or union representative Clay.

(3) Michalowicz was the person who decided to terminate Carson, with input from

Williams. Michalowicz said that he was not initially aware that Carson was the same person who made the 2004 Charge more than two years earlier. Carson has proffered no evidence that this is not true.

(4) The evidence shows that Stawikowski, as head of HR, had involvement in the termination solely as effected by individuals below him in the chain of command.

(5) Carson concedes that none of the Ford employees involved in the events, investigation, or decision to terminate him made any derogatory or discriminatory statements toward him regarding his medical restrictions prior to his termination.

**3.**

Even if Carson had presented a prima facie claim of retaliation, Ford has asserted a legitimate, non-discriminatory reason for terminating Carson and Carson has failed to proffer probative evidence that this reason is pretext.

Ford says its reason for terminating Carson was improper conduct, specifically, the unauthorized accessing of an employee's file cabinet. Carson does not rebut that a factual basis for the termination exists, although he disagrees with Mende's account and the decision makers' interpretation of those facts. He admits that an investigation occurred prior to his termination, although he disputes its quality.

Carson has proffered no evidence that "improper conduct" is an insufficient reason for termination.

Finally, Carson provides no evidence that the termination was motivated by retaliatory animus. While Carson contends that Michalowicz and others at Ford involved with his termination knew of the 2004 Charge and his medical restrictions, he has proffered no evidence that either was mentioned or discussed at any time by any of

the individuals involved prior to his termination. Michalowicz was the only one involved in the February 2007 decision who was aware of the 2004 Charge, and he testified that he did not realize the persons involved were the same—Carson—until one month after the termination. Carson has proffered no evidence to rebut this statement.

### B. Disability Discrimination

To recover under Title I and V of the ADA, 42 U.S.C. § 1210, and Michigan's Persons with Disabilities Act, M.C.L. 37.1101, Carson must first demonstrate: (1) he is an individual with a disability, (2) he was otherwise qualified for the job at issue, with or without reasonable accommodations, and (3) Ford refused to make a reasonable accommodation of his disability or made a materially adverse employment decision solely because of his disability. Smith v. Ameritech, 129 F.3d 857, 866 (6th Cir. 1997). Like retaliation claims, discrimination claims are analyzed under the McDonnell Douglas-Burdine burden-shifting framework; if Ford articulates a legitimate, non-discriminatory reason, Carson must present enough evidence such that a jury could reasonably reject Ford's reason. Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1083 (6th Cir. 1994).

Ford has presented evidence that it reasonably accommodated Carson's medical restrictions. By late summer of 2005, his two medical restrictions were: (1) frequent access to a restroom facility and (2) a gate pass so that he could park near the entrance to the ROB. Carson testified that he was provided with both these accommodations. Carpenter testified that it was due to the availability of restrooms that Carson was assigned to the ROB, where one of his tasks included the cleaning of restrooms.

Carson says that Ford failed to accommodate his restrictions by making him

11

clean "dirty restrooms." But Carson's job responsibilities included cleaning restrooms that were dirty. There is no evidence that he grieved the required cleaning of dirty restrooms as a violation of his restrictions. Further, when he complained about cleaning the restrooms, he was reassigned.

Finally, as discussed above, Carson has proffered no evidence to rebut Ford's evidence that Williams and Michalowicz were not aware of his disability when they made the decision to terminate him.

## V. CONCLUSION

Because Carson has proffered no probative evidence to rebut Ford's evidence that he was terminated for improper conduct based upon his unauthorized accessing of Moynihan's file cabinets, Ford's motion for summary judgment has been granted.

SO ORDERED.


Dated: April 27, 2009        s/Avern Cohn
                             AVERN COHN
                             UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, April 27, 2009, by electronic and/or ordinary mail.

                             s/Julie Owens
                             Case Manager, (313) 234-5160